UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                          Case No. 20-49216

JASON ROBERT WYLIE,
and LEAH S. WYLIE,                              Chapter 7

                    Debtors.                    Judge Thomas J. Tucker
_____/

TIMOTHY MILLER, TRUSTEE,

                    Plaintiff,

vs.                                             Adv. No. 21-4186

KATHLEEN SULLIVAN,

                    Defendant.
_____/

**POST-TRIAL OPINION**

**I. Introduction**

Bankruptcy Debtors Jason Wylie and Leah Wylie, who are husband and wife, filed a joint

Chapter 7 petition on August 27, 2020. In this adversary proceeding, the Plaintiff Chapter 7

Trustee alleges that the Debtor Jason Wylie fraudulently transferred real estate located at 6401

Mast, Dexter, Michigan (the "6401 Mast Property"), to his mother, Defendant Kathleen Sullivan.

This transfer was done by means of a deed entitled "Quitclaim Deed in Lieu of Foreclosure" that

was signed on August 3, 2019, and that was recorded with the Washtenaw County, Michigan

Register of Deeds on August 19, 2019.

The Trustee alleges in his complaint[1] that this transfer of the 6401 Mast Property

_____
[1] Docket # 1.

(sometimes referred to below as the "Transfer") is avoidable under 11 U.S.C. § 548(a)(1)(B), as a constructively fraudulent transfer (Count I of the Trustee's complaint); and under 11 U.S.C. § 548(a)(1)(A), as a transfer made by the Debtor with actual intent to hinder, delay, or defraud creditors (Count II of the Trustee's complaint).[2] In Count III of his complaint, the Trustee seeks relief under 11 U.S.C. §§ 550 and 551, based on the avoidance of the Transfer under the other two counts, including recovery from the Defendant of the 6401 Mast Property or the value of the 6401 Mast Property.[3]

After the Court heard and denied the motion for summary judgment filed by the Trustee, the Court held a bench trial. The parties then filed post-trial briefs. The Court now will decide this adversary proceeding.

The Court has considered all of the evidence and arguments presented by the parties. This includes the testimony of all the witnesses — namely, the bankruptcy Debtors Jason Wylie and Leah Wylie; the Defendant Kathleen Sullivan; the Defendant's attorney Thomas R. Morris;

---

[2] These provisions in § 548(a) state, in pertinent part:

> (1) The trustee may avoid any transfer . . . of an interest of the debtor in property, . . . that was made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . ., indebted; or
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer . . .; and
>
> (ii)(I) was insolvent on the date that such transfer was made . . ., or became insolvent as a result of such transfer. . . .

[3] Compl. (Docket # 1) at ¶ 41.

and two expert valuation witnesses called by the Trustee — *i.e.*, Dean W. Dryer and Michael T. Williams. And the Court has considered all the exhibits that were admitted into evidence.[4] This Opinion states the Court's findings of fact and conclusions of law.

For the reasons stated below, the Court now finds in favor of the Trustee, and will enter judgment accordingly.

## II. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) (providing for jurisdiction "of all civil proceedings arising under title 11, or arising in or related to cases under title 11"), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). The Trustee's claims for avoidance and recovery of a fraudulent transfer are core proceedings under 28 U.S.C. § 157(b)(2)(H).

This adversary proceeding also is "core," with respect to each of the Trustee's claims in Counts I through III of the complaint, because each of these counts falls within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen (In re Trans-Industries,*

---

[4] In this Opinion, the Court will cite the trial exhibits using this format: "PX-__" for the Trustee's exhibits; and "DX-__," for the Defendant's exhibits.

The Trustee's exhibits admitted into evidence are PX exhibit nos. 1-3, 5-6, 8-13, 17-18, 22, 24-25, 26, and 31. All of the Trustee's exhibits are filed at Docket # 119. An additional copy of PX-29 and PX-30 were filed at Docket ## 135 and 136, but while PX-29 and PX-30 were referred to and discussed at trial, they were not admitted into evidence.

The Defendant's exhibits admitted into evidence are DX exhibit letters A, B, D, F, H, J, K, L, M, N, and U. The Defendant's exhibits are filed at Docket ##120 and 123.

*Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). With regard to each of these three counts, this is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *id.*, namely, 11 U.S.C. §§ 548 and 550. And these counts are proceedings "arising in" a case under title 11, because they are proceedings that "by their very nature, could arise only in bankruptcy cases." *Id.*

For these reasons, this Court has *statutory* authority, under 28 U.S.C. § 157(b)(1), to enter a final judgment on Counts I, II, and III of the Trustee's complaint. If and to the extent this Court might otherwise lack *constitutional* authority to enter a final judgment, under *Stern v. Marshall*, 564 U.S. 462 (2011), such a problem does not exist in this case. This is because each of the parties has expressly, knowingly, and voluntarily consented to this bankruptcy court entering a final order or judgment, as permitted by 28 U.S.C. § 157(c)(2).[5] Given that consent, this bankruptcy court has both statutory and constitutional authority to enter a final judgment on the Trustee's claims in Counts I, II, and III of the complaint. *See Ralph Roberts Realty, LLC v. Savoy* (*In re Ralph Roberts Realty*), 562 B.R. 144, 147-48 (Bankr. E.D. Mich. 2016) (discussing, among other cases, *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015) ); *Dery v. Karafa* (*In re Dearborn Bancorp, Inc.*), 583 B.R. 395, 400 (Bankr. E.D. Mich. 2018)).

## III. Discussion

### A. Count I of the Trustee's complaint: the Trustee's constructive fraudulent transfer claim under 11 U.S.C. § 548(a)(1)(B)

#### 1. Framing the dispute

The Court first will discuss the Trustee's claim that the Transfer is avoidable as

---

[5] *See* Report of the Parties' Rule 26(f) Conference (Docket # 8) at 3 ¶ 3(g).

constructively fraudulent, under 11 U.S.C. § 548(a)(1)(B). This section states, in the parts relevant to this case:

> (1) The trustee may avoid any transfer . . . of an interest of the debtor in property, . . . that was made . . . within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> . . .
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer . . .; and
>
> (ii)(I) was insolvent on the date that such transfer was made . . . .

As the Court previously ruled in deciding the Trustee's motion for summary judgment, all but one of the necessary elements for avoidance under this statute are established:

> 4. There is no genuine issue of material fact regarding the following elements of the Plaintiff's avoidance claims, and these elements are deemed established in this adversary proceeding, including for purposes of trial:
>
>> A. The Transfer was a "transfer of an interest of the debtor [*i.e.*, the Debtor Jason Wylie] in property" within the meaning of 11 U.S.C. § 548(a)(1), because at the time of the Transfer, the Debtor Jason Wylie was the sole owner of the Mast Property, and the Transfer transferred sole ownership of the Mast Property to the Defendant, Kathleen Sullivan.
>>
>> B. The Transfer "was made . . . on or within 2 years before the date of the filing of the petition [*i.e.*, the bankruptcy petition filed by the Debtor Jason Wylie and his spouse]" within the meaning of 11 U.S.C. § 548(a)(1).
>>
>> C. The Debtor Jason Wylie and his spouse both were "insolvent on the date that [the Transfer] was made" within the meaning of 11 U.S.C. § 548(a)(1)(B)(ii)(I).
>>
>> [footnote: *See, e.g.*, Answer to Compl. (Docket # 5) at ¶ 26 ("Defendant admits that the [T]ransfer was within 2 years

of the Petition and while the Debtors were insolvent,
. . . .").]<sup>6</sup>

This leaves only one element in dispute: the Trustee must prove, by a preponderance of the evidence, that the Debtor, Jason Wylie, "received less than a reasonably equivalent value in exchange for" the Transfer.  At trial, the Trustee attempted to prove this element, and the Defendant Kathleen Sullivan disputed it.

This Court has previously discussed the meaning of the § 548 phrase "reasonably equivalent value," in part, as follows:

> The Bankruptcy Code does not define the phrase "reasonably equivalent value."  But the Code defines "value," for purposes of § 548, as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but [it] does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor."  11 U.S.C. § 548(d)(2)(A).
> . . . .
>
> The Sixth Circuit discussed the § 548 concepts of "value" and "reasonably equivalent value" in *Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)*, 196 Fed.App'x. 337, No. 05-5744, 2006 WL 2380887 (6th Cir. Aug. 17, 2006).  In *Lisle*, the court held that "[a] court considering [the question of "reasonably equivalent value"] should first determine whether the debtor received *any* value in the exchange.  If so, the court should determine if the value received was reasonably equivalent."  196 Fed.App'x. at 341 (emphasis in original)(citation omitted).

*Gold v. Marquette Univ. (In re Leonard)*, 454 B.R. 444, 455 (Bankr. E.D. Mich. 2011) (footnote omitted).

At the time the Transfer of the 6401 Mast Property was made, that property was unencumbered; that is, it was not subject to any mortgage or lien in favor of the Defendant or

---

<sup>6</sup> "Opinion and Order Denying Plaintiff's Motion for Summary Judgment" (Docket # 71) at 4-5 ¶ 4, 5 n.9 (footnote omitted); *see also* Final Pretrial Order (Docket # 112) at 41 ¶ 16.

6

anyone else. The only form of "value" that the Defendant gave, in exchange for the Debtor's transfer of the 6401 Mast Property, was the satisfaction of antecedent debt that the Debtor owed to the Defendant. The dispute concerns whether that "value" was reasonably equivalent to the value of the property transferred to the Defendant.

The dispute is complicated by the fact that the Transfer at issue was part of a single larger transaction between the Debtor Jason Wylie and his mother, the Defendant Kathleen Sullivan. The basic elements of the larger transaction are as follows:

1. In August 2019, Jason Wylie (sometimes referred to below as "Jason") transferred to Kathleen Sullivan (sometimes referred to below as "Kathleen"), by quitclaim deeds, three pieces of real property that Jason owned. The properties were: (1) the 6401 Mast property, which Jason had purchased from Kathleen in 2011;[7] (2) property located at 6600 Gregory Road, Dexter, Michigan (the "6600 Gregory property"); and (3) property located at 7575 N. Territorial Road, Dexter, Michigan (the "7575 N. Territorial property"). At the time of the transfers in 2019, while the 6401 Mast property was not encumbered by any mortgage,[8] the 6600 Gregory property and the 7575 N. Territorial property were encumbered by mortgages in favor of Kathleen. Jason had

_____

[7] *See* PX-1 (copy of the August 2019 quitclaim deed for the 6401 Mast property). The 6401 Mast property is roughly 80 acres of farmland. In 2011, Kathleen had sold the 6401 Mast property to Jason by a quitclaim deed, and at the same time Jason executed a mortgage note in the amount of $300,000 and a mortgage for this property, both in favor of Kathleen. The quitclaim deed and the mortgage were recorded on January 27, 2011. Copies of those documents are contained in DX-B. (*See* DX-B (Docket # 123-1) at pdf p. 6 (quitclaim deed, references to Parcel C and Parcel D, Tax Parcel No. C-03-20-300-006), pdf p. 18 ($300,000 Mortgage Note), pdf p. 14 (Mortgage)); *see also* PX-8-10). As further discussed later in this Opinion, the Mortgage Note was amended in February 2014 (*see* DX-F (Docket # 120-5) at pdf p. 6; PX-11). Then soon after that, it was deemed paid in full, and the mortgage on the 6401 Mast property was discharged, by instruments signed by Kathleen on June 17, 2014, and the mortgage discharge was recorded on June 19, 2014. (*See* PX-12, 13).

[8] *See supra* note 7.

7

purchased those two properties from Kathleen in 2014 and 2011, respectively.[9]  The Trustee and Kathleen dispute what the values of the three properties were in August 2019, at the time Jason transferred them back to Kathleen.

2.  In exchange for the transfers, Kathleen released Jason from certain debts that Jason then owed to Kathleen, such that the debts were fully satisfied.  Kathleen contends that the debts she released consisted of all of Jason's debts to her.  The Trustee contends that the debts released were only certain specific debts, and not all of the debts that Kathleen alleges she was owed at the time.  The parties also dispute, at least to some extent, what the amounts of the various debts were at the time.

The relatedness of the three real estate transfers and the release of debt by Kathleen are shown not only by the testimony of Jason and Kathleen, but also by a written agreement they made, entitled "Mutual Release in Full."[10]  That agreement was signed by Jason on August 3, 2019 and by Kathleen on August 12, 2019.[11]  In that agreement, Jason and Kathleen gave each

---

[9]  The 7575 N. Territorial property is roughly 66 acres of farmland.  Kathleen had sold the 7575 N. Territorial property to Jason by a quitclaim deed, and at the same time Jason executed a mortgage note in the amount of $500,000 and a mortgage for this property, both in favor of Kathleen.  The mortgage and the mortgage note each were dated and signed on January 11, 2011.  The quitclaim deed and the mortgage were recorded on January 27, 2011.  Copies of those documents are contained in DX-B.  (*See* DX-B (Docket # 123-1) at pdf p. 6 (quitclaim deed, reference to Tax Parcel No. C-03-19-100-001), pdf p. 27 ($500,000 Mortgage Note), pdf p. 23 (Mortgage)).

The 6600 Gregory property is roughly 2 acres of land, containing a single family home.  In 2014, Kathleen had sold the 6600 Gregory property to Jason, and on June 17, 2014, Jason executed a mortgage note in the amount of $270,450 and a mortgage for this property, both in favor of Kathleen.  (*See* PX-26 ($270,450 Mortgage Note, signed by both Jason and Kathleen on June 17, 2014); DX-U ("Closing Statement" for Kathleen's sale of the 6600 Gregory property to Jason, signed by Kathleen and dated "June __, 2014")).

[10]  DX-M.

[11]  *See id.* at pdf p. 2; Tr. of testimony of Kathleen Sullivan (Docket # 153) at 148, 153.

8

other releases.[12]  Kathleen's release of debt owed by Jason was given in exchange for the delivery

of the three quitclaim deeds.[13]  The identity and the amounts of the debts released by Kathleen is

discussed in more detail below.

The Court must determine (1) the total value of the three properties that Jason transferred

to Kathleen; and (2) the total amount of Jason's debt to Kathleen that was released in exchange

for the transfers.  This is necessary in order to determine whether Jason received reasonably

equivalent value in exchange for transferring the 6401 Mast Property to Kathleen.  The Court

cannot view the transfer of the 6401 Mast Property in isolation, because it was but one of several

integral parts of the larger transaction.  Rather, the Court must consider the entire transaction.

*See, e.g., Wells v. THB America, LLC* (*In re Clements Mfg. Liquidation Co., LLC*), 521 B.R. 231,

242-43 (Bankr. E.D. Mich. 2014) (citing numerous cases).  As one case described it,

> [T]here is a well recognized exception to the rule that each transfer
> must be evaluated as a separate conveyance.  "Where a transfer is
> actually 'only a step in a general plan,' an evaluation is made of the
> entire plan and its overall implications."  *In re Sunbeam Corp.,* 284
> B.R. 355, 370 (Bkrtcy.S.D.N.Y. 2002) (citing *Orr v. Kinderhill
> Corp.,* 991 F.2d 31, 35 (2d Cir.1993)).  Applying this exception,
> courts have "collapsed" a series of transfers to assess the existence
> of fair consideration and the knowledge and intent of the parties, in
> order to determine whether or not a particular transaction
> constitutes a fraudulent conveyance.  *See, e.g., Orr,* 991 F.2d at 35.

*Mills v. Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 254-55 (S.D.N.Y. 2006).

The parties do not dispute that this is the approach the Court must take in this case.

Instead, the parties each seek to apply this approach in their favor, as shown particularly in the

---

[12]  However, no one contends that Kathleen owed any debt to Jason at the time.

[13]  In addition to DX-M, *see also* DX-L; Tr. of testimony of Kathleen Sullivan (Docket # 153) at
198-99 (discussing DX-L).

post-trial briefs the parties filed.[14]  The Trustee argues that the amount of Jason's debt to Kathleen that was released was far less than the total value of the three properties that Jason transferred to Kathleen.  Kathleen argues that the amount of the debt released exceeded, or at least was reasonably equivalent to, the total value of the properties transferred.

### 2. The total amount of debt released

Kathleen claims that she released Jason from several different items of debt, totaling $1,044,043.33.  As explained below, however, the Court finds that Kathleen released Jason from a total of only $737,516.12 in debt.  The Court will discuss each item of possible debt.

### a. The debt on the $500,000 Amended Mortgage Note, secured by a mortgage on the 7575 N. Territorial property

As described in footnote 9 above, when Kathleen sold to Jason the 7575 N. Territorial property in 2011, Jason signed a mortgage note in favor of Kathleen, in the amount of $500,000.00, and Jason's debt under that note was secured by a mortgage he gave to Kathleen. In 2014, Jason and Kathleen agreed to modify the 2011 mortgage note.  They did so by signing an amended note dated February 22, 2014, entitled "Amended Mortgage Note."[15]

As with the original 2011 mortgage note, under the 2014 Amended Mortgage Note, Jason promised to pay to Kathleen the principal sum of $500,000.00 "with interest at the rate of [2.40] percent per annum."[16]  The Amended Mortgage Note changed some of the other terms of the original note, and the Amended Mortgage Note stated that it "amends and replaces" the original

---

[14]  Docket ## 141, 142, 143, 145, 147.

[15]  "Amended Mortgage Note" (PX-24) at pdf pp. 1-2.

[16]  *Id.* at pdf p. 1.

10

note "in its entirety."[17]

The Amended Mortgage Note includes the following terms and recitals:

- that Jason had been paying interest only on the original note, in monthly installments of $1,000.00 each, and Jason was to "continue to pay such interest payments for a period ending February 15, 2032;"

- that Jason had paid these interest payments to Christopher Sullivan, and was to continue to pay the interest payments to Christopher Sullivan, due to Kathleen having assigned her rights to those interest payments to Christopher Sullivan. (Christopher Sullivan is the ex husband of Kathleen, and Jason's stepfather.);

- that "[a]s long as [Jason] is not in default, no payment of principal shall be due;"

- that "Beginning February 15, 2012, [Jason] has paid all interest payments due under this Amended Mortgage Note. The next monthly payment of interest only is due March 1, 2014;"

- that if Jason makes all interest payments due under this Amended Mortgage Note — *i.e.*, $1,000.00 per month until February 15, 2032 — then "this Amended Mortgage Note shall be immediately discharged as paid in full" and Kathleen "shall immediately discharge the Mortgage" on the 7175 N. Territorial property;

- that if and when Christopher Sullivan died before all the interest payments were made, Jason was to pay the interest to Kathleen, and if Kathleen then also died or was deceased, then "the entire unpaid balance of principal and interest due on this Amended Mortgage Note and the [7575 N. Territorial mortgage] shall be immediately discharged as paid in full;"

- However, "should default be made in the payment of any interest and/or principal due under this Amended Mortgage Note for a period of [60] days, then such default shall mature the entire indebtedness evidenced hereby."[18]

The evidence is undisputed that Jason stopped making the interest payments under the

Amended Mortgage Note in August 2018, and made no further payments under that note after

---

[17] *Id.*

[18] *Id.*

11

that.[19]  And it is undisputed that neither Kathleen nor Christopher Sullivan are deceased.  As a result, beginning 60 days after Jason stopped making the monthly interest payments (*i.e.*, beginning no later than November 1, 2018), Jason owed to Kathleen the entire indebtedness of principal ($500,000.00).  Jason also owed the unpaid interest to Christopher Sullivan.

Therefore, by the time Jason and Kathleen entered into the agreement reflected in the "Mutual Release in Full" — August 12, 2019[20] — Jason's debt owing to Kathleen under the Amended Mortgage Note was the $500,000.00 principal amount.

The Trustee argues that the debt amount under the Amended Mortgage Note was only $139,000.00, because the Amended Mortgage Note provided that Jason could pay the note in full if he made the $1,000.00 per month in interest payments until February 25, 2032.  The Trustee calculates that by the time Jason stopped making the monthly interest payments, there were only 139 monthly interest payments left to be paid, totaling $139,000.00.

The Trustee's argument is wrong, because it overlooks the default provision in the Amended Mortgage Note, described above.  Under that provision, the entire indebtedness under the note — principal and interest — became due 60 days after Jason defaulted by stopping the interest payments.  And when that occurred, Jason owed the entire $500,000.00 in principal to Kathleen, plus interest owing to Christopher Sullivan.

Based on the foregoing, the Court finds that just prior to entering into the "Mutual Release in Full" transaction with Kathleen in August 2019, Jason owed a debt of $500,000.00 to

---

[19]  *See* Tr. of testimony of Jason Wylie (Docket # 153) at 233.

[20]  As noted earlier in this Opinion, August 12, 2019 is the date on which the last of these two parties signed the "Mutual Release in Full" agreement.

Kathleen on the Amended Mortgage Note, secured by a mortgage on the 7575 N. Territorial property.

**b.  The debt on the $270,450.00 Mortgage Note dated June 17, 2014, secured by a mortgage on the 6600 Gregory property**

As described in footnote 9 above, when Kathleen sold to Jason the 6600 Gregory property in 2014, Jason signed a mortgage note in favor of Kathleen, in the amount of $270,450.00, and Jason's debt under that note was secured by a mortgage on the 6600 Gregory property.

The note, entitled "Mortgage Note," was signed by Jason and Kathleen on June 17, 2014.[21]  Under this note (the "6600 Gregory Note"), Jason promised to pay to Kathleen "the principal sum of [$270,450.00] with interest at the rate of [3.1] percent per annum."[22]  The note required Jason to pay Kathleen monthly payments of principal and interest of $1,500.00, due on the first day of each month starting July 1, 2014, with the entire balance due and payable "on or before October 1, 2034."[23]

The 6600 Gregory Note also stated that "[i]n the event of [Kathleen's] death, then the entire unpaid balance of principal and interest due on this Mortgage Note and the Mortgage . . . shall be immediately discharged as paid in full."  Otherwise, the note provided, "should default be made in the payment of any interest and/or principal due under this Mortgage Note for a period of [60] days, then such default shall mature the entire indebtedness evidenced hereby."[24]

---

[21]  "Mortgage Note" (PX-26).

[22]  *Id.*

[23]  *Id.*

[24]  *Id.*

The evidence is undisputed that Jason made the $1,500.00 per month payments due under the 6600 Gregory Note to Kathleen through June 2018, and that he failed to make any payments after that.[25] And again, Kathleen obviously is not deceased. As a result, beginning August 31, 2018 (60 days after July 1, 2018 when Jason stopped making the monthly payments due on the 6600 Gregory Note), Jason owed to Kathleen the entire indebtedness of principal and interest under the 6600 Gregory Note.

In one of her post-trial briefs, Kathleen calculates that the total of this debt was $239,235.90 as of August 12, 2019, the date on which Jason and Kathleen entered into the "Mutual Release in Full" agreement.[26] The Trustee argues that the correct amount is $195,766.80.[27]

The Court finds that Kathleen's calculation is close to being correct. Kathleen's calculation is in two parts. For the first part, Kathleen calculates that after Jason made his last monthly payment of $1,500.00 in June 2018, the balance owing on the 6600 Gregory Note was $230,466.80. Kathleen testified to this effect, purportedly based on an amortization table that she

---

[25] *See* Tr. of testimony of Kathleen Sullivan (Docket # 153) at 116, 169; PX-25 (12-1-2018 Aff. of Kathleen) at item no. 11 and at "☆."

[26] *See* Def.'s Post-Trial Br. (Docket # 141) at pdf p. 13.

[27] *See* Trustee's Post-Trial Br. (Docket # 142) at pdf p. 6 (chart titled "Value of Secured Notes Released"). Later in his brief, however, the Trustee argues that "[t]here is no credible evidence as the actual amount owed on the 6600 Gregory Note." *Id.* at pdf p. 8. The Court disagrees, as explained above. But if there really were no credible evidence of how much Jason owed Kathleen on the 6600 Gregory Note, that would not bode well for the Trustee. It would leave a gap in the Trustee's attempt to prove his case. The Trustee has the burden of proving by a preponderance of the evidence that Jason did not receive reasonably equivalent value from Kathleen in the "Mutual Release in Full" transaction.

ran during the trial.[28]  While Kathleen's amortization table was not admitted into evidence, the

Court can run, and has run, its own amortization table using Excel, and from that, the Court finds

that the loan balance after Jason made his last monthly payment in June 2018 was $229,555.66.[29]

The Court notes that the Trustee does not question the accuracy of Kathleen's

amortization calculation of $230,466.80, in his post-trial brief.  Rather, the Trustee appears to

accept Kathleen's number, but then seek a reduction from it for reasons unrelated to the accuracy

of Kathleen's amortization testimony.[30]

For the second part of Kathleen's calculation of the balance owing on the 6600 Gregory

Note, Kathleen calculates that the interest that accrued under the note from the date of Jason's

default until August 12, 2019, at 3.1 % per annum, was $8,769.10, making the total debt

$239,235.90 as of August 12, 2019.[31]

The Court finds that Kathleen's calculation of the post-default interest is slightly off, for

two reasons.  First, Kathleen's brief measured the interest from June 1, 2018 to August 12, 2019.

But the evidence is that Jason made the monthly payment that was due on June 1, 2018.  The

next payment, which Jason failed to make, was due on July 1, 2018, so that is the date of Jason's

---

[28]  *See* Tr. of testimony of Kathleen Sullivan (Docket # 153) at 170-71.  The amortization table itself was marked as PX-27, but was not admitted into evidence.  That table shows a slightly different balance of $230,460.30 on the 6600 Gregory Note after the June 2018 payment. (*See* PX-27 at pdf p. 2).

[29]  This is the same amount as the loan balance showing in Kathleen's amortization table, PX-27, after a monthly payment in July 2018.  But Kathleen's amortization table incorrectly assumes that the first monthly payment on the loan was in August 2014, rather than July 2014.  As noted above, however, the first $1,500.00 monthly payment was due on July 1, 2014.

[30]  *See* Trustee's Post-Trial Br. (Docket # 142) at pdf p. 6 (chart titled "Value of Secured Notes Released"), pdf p. 6 n.2, pdf pp. 7-8.

[31]  *See* Def.'s Post-Trial Br. (Docket # 141) at pdf p. 13.

15

default. The period from July 1, 2018 to August 12, 2019 is 1 year and 42 days. The second reason why Kathleen's post-default interest calculation is incorrect is because it assumes that the loan balance at the time of Jason's default was $230,466.80, while the Court has calculated that number to be $229,555.66, as explained above.

The Court calculates that the accrued interest on the $229,555.66 note balance, for the period from July 1, 2018 to August 12, 2019, using 3.1% per annum, compounded annually, was $7,960.46 as of August 12, 2019. That means that the total debt owing by Jason to Kathleen on the 6600 Gregory Note, as of August 12, 2019, was $237,516.12.

The Trustee's contrary calculation, that the 6600 Gregory Note balance was $195,766.80, is flawed. That calculation takes the $230,466.80 note balance as of July 1, 2018, as calculated by Kathleen, and (1) reduces it by $34,700.00; and (2) adds no interest to the debt for the time period of July 1, 2018 to August 12, 2019. Both of these calculation steps by the Trustee are incorrect.

First, the Trustee's subtraction of $34,700.00 from the debt is because the original 6600 Gregory Note balance, $270,450.00, included not just the purchase price for Jason's purchase of the 6600 Gregory property from Kathleen, but also additional consideration flowing to Jason, which Jason was paying for as part of his obligation under the 6600 Gregory Note. But that does not mean that Jason did not owe Kathleen the full face amount of the 6600 Gregory Note when Jason made that note. He did. And the Closing Statement for Jason's purchase of the 6600 Gregory property shows that these additional amounts are properly included in the amount of debt Jason owed under the 6600 Gregory Note.[32]

---

[32] *See* DX-U.

Second, the Trustee is mistaken in his failure to include any post-default interest on the 6600 Gregory Note balance, for the time period from July 1, 2018 to the August 12, 2019 date of the "Mutual Release in Full" transaction. That interest is properly considered part of the debt that Jason owed to Kathleen when Kathleen released Jason from his debt under the 6600 Gregory Note.

Based on the foregoing, the Court finds that just prior to entering into the "Mutual Release in Full" transaction with Kathleen in August 2019, Jason owed a debt of $237,516.12 to Kathleen on the 6600 Gregory Note, secured by a mortgage on the 6600 Gregory property.

**c. The debt on the original and amended $300,000.00 mortgage notes that were originally secured by a mortgage on the 6401 Mast property**

As described in footnote 7 above, when Kathleen sold to Jason the 6401 Mast property in 2011, Jason signed a mortgage note in favor of Kathleen, in the amount of $300,000.00, and Jason's debt under that note was secured by a mortgage he gave to Kathleen. In 2014, Jason and Kathleen agreed to modify the 2011 mortgage note. They did so by signing an amended note dated February 22, 2014, entitled "Amended Mortgage Note."[33]

Then, roughly four months later, the Amended Mortgage Note was deemed paid in full, and the mortgage on the 6401 Mast property was discharged. This was done by instruments signed by Kathleen on June 17, 2014.[34] The mortgage discharge was recorded on June 19, 2014.[35]

_____

[33] PX-11.

[34] *See* Tr. of testimony of Kathleen Sullivan (Docket # 153) at 103-05; PX-12, 13; Tr. of testimony of Jason Wylie (Docket # 153) at 224.

[35] *See* PX-13.

17

The reason for this release was that when Jason bought the 6600 Gregory property from Kathleen in June 2014, all of Jason's then-existing debt under the Amended Mortgage Note for the 6401 Mast property, $105,750.00, was rolled into the 6600 Gregory Note, which was then secured by the mortgage on the 6600 Gregory property.[36]  This had the effect of increasing the interest rate on Jason's old mortgage debt for the 6401 Mast property, from 2.00 percent per annum to 3.1 percent per annum under the 6600 Gregory Note.

It is undisputed, and the Court finds, that Jason's debt to Kathleen under the Mortgage Note and the Amended Mortgage Note for the 6401 Mast property was eliminated in June 2014, and therefore was zero when Jason and Kathleen entered into their "Mutual Release in Full" agreement in August 2019.

### d. $10,000 in cash that Jason was to pay to Kathleen at the 2014 closing of the sale of the 6600 Gregory property, but that Kathleen alleges was never paid

The Closing Statement for Jason's June 2014 purchase of the 6600 Gregory property from Kathleen indicates that there was a "NET AMOUNT TO BE PAID TO SELLER" of $10,000.00.[37]  For the first time at trial, and then in her post-trial briefs, Kathleen has alleged that she was never paid this $10,000.00.  As such, Kathleen alleges, this $10,000.00 was part of the debt Jason owed her, and that Kathleen released as part of the August 2019 "Mutual Release in Full" agreement.

The Trustee disputes that Jason did not pay this $10,000.00 as part of the 6600 Gregory

---

[36]  *See* DX-U (Closing Statement for Jason's purchase of the 6600 Gregory property); Tr. of testimony of Kathleen Sullivan (Docket # 153) at 122-23, 168; Tr. of testimony of Jason Wylie (Docket # 153) at 232.

[37]  *See* DX-U.

18

property closing, and he also disputes that any such debt was released by Kathleen.

The Court finds that Kathleen was paid this $10,000.00, as part of the June 2014 closing of her sale of the 6600 Gregory property. Kathleen's testimony to the contrary[38] is not credible, and the Court does not believe it, for the following reasons.

First, Kathleen admitted that she signed the Closing Statement for the 6600 Gregory property (DX-U),[39] which listed the $10,000.00 as being "NET TO BE PAID TO SELLER." That Closing Statement indicates that Kathleen did receive this $10,000.00. At the bottom it contains an acknowledgment that Kathleen made when she signed the document, that "[w]e acknowledge and agree to the correctness of the above Closing Statement, and authorize **and ratify** the disbursement of the funds shown."[40] That ratification language implies that the funds listed on the Closing Statement, including the $10,000.00 to Kathleen, were disbursed.

Second, Jason testified that he believes that he did pay this $10,000.00 to Kathleen.[41]

Third, as the Trustee points out, Kathleen made no mention of Jason owing her this $10,000.00 in the very detailed hand-written affidavit that she prepared and signed on December 1, 2018, even though that affidavit listed the numerous other debts that Kathleen alleges Jason owed her.[42] The Court views this omission as strong evidence that Jason did ***not*** owe Kathleen

---

[38] *See, e.g.,* Tr. of testimony of Kathleen Sullivan (Docket # 153) at 124, 196-97, 215-16.

[39] *Id.* at 125.

[40] DX-U (emphasis added).

[41] *See* Tr. of testimony of Jason Wylie (Docket # 153) at 231 ("I thought I did."), 256 ("I believe I did. I don't know.").

[42] *See* PX-25.

19

this $10,000.00 as of December 2018 or thereafter.

Fourth, Kathleen and Jason both testified that Jason generally made payments to Kathleen by depositing money into one of her bank accounts.[43] Yet Kathleen did not substantiate the ***non-payment*** to her of this $10,000.00 by producing at trial any of her bank records from the time of the June 2014 closing on the 6600 Gregory property.

Fifth, as the Trustee correctly points out, at no time during the litigation of this case did Kathleen ever mention having been owed this $10,000.00, until she testified at trial. For example, there is no specific mention of this in Kathleen's briefs or affidavits filed in response to the Trustee's summary judgment motion,[44] or in the lengthy joint final pretrial order.[45] Nor is there any specific mention of this alleged debt in the "Mutual Release in Full" agreement itself.[46]

For these reasons, the Court finds that Jason did not owe the $10,000.00 in question to Kathleen before or at the time the parties entered into the "Mutual Release in Full" transaction in August 2019.

**e. The debt on the $200,000 note by Wylie's Rental & Excavating, Inc.**

Wylie's Rental & Excavating, Inc. ("Wylie's Rental") was a Michigan corporation, and Jason Wylie was its sole shareholder and president.[47] According to Jason, this company "used to

---

[43] *See* Tr. of testimony of Jason Wylie (Docket # 153) at 256-57; Tr. of testimony of Kathleen Sullivan (Docket # 153) at 163-64.

[44] Docket ## 29, 32, 51.

[45] Docket # 112.

[46] DX-M.

[47] Tr. of testimony of Jason Wylie (Docket # 153) at 238 ("Jason is the president and the owner[.]").

be a rental company, and then it because a farming company."[48]  In January 2011, to obtain "a

loan to buy more farming equipment,"[49] Wylie's Rental borrowed $200,000.00 from Kathleen

Sullivan, and executed a promissory note for that amount.  The promissory note was signed by

Jason Wylie on behalf of Wylie's Rental, and also individually, and by Kathleen Sullivan, all on

January 17, 2011.[50]  The parties later amended and replaced that promissory note with a new

note, which they signed on January 1, 2014.[51]  That new note stated that the January 17, 2011

note, "and any other previously dated Promissory Notes between Wylie Rental and Kathy

Sullivan" are "now all null and void."[52]

Under that new note (the "Wylie's Rental Note"), "For value received, the **Wylie's**

**Rental & Excavating, Inc., a Michigan Corporation**, . . . (hereinafter referred to as "Wylie

Rental")" promised "to pay to the order of **KATHLEEN W. SULLIVAN**" "the principal sum of

[$200,000.00] with interest at the rate of [2.91] percent per annum."[53]  The Wylie's Rental Note

stated that payments of principal and interest "shall be paid by Wylie Rental" to Kathleen in

monthly installments of $833.33 each, starting January 1, 2012, "for a period of 30 years and will

be paid in full at the end of 30 years."[54]

---

[48]  *Id.* at 234.

[49]  *Id.* at 235.

[50]  DX-A.

[51]  DX-D.

[52]  *Id.*

[53]  *Id.* (bold and capitalization in original).

[54]  *Id.*

The note also stated:

> This Promissory Note is only assignable by mutual written
> agreement of both Wylie Rental and Kathy Sullivan.[55]

The last paragraph of the Wylie's Rental Note contained the following provision

concerning Jason (the "Life Insurance Collateral Provision"):

> This Promissory Note is backed by a Life Insurance Policy in the
> event of the death of Jason Wylie. In the event that the proceeds of
> such life insurance policy exceed the balance of any unpaid
> principal and interest due on this Promissory Note, then the
> balance remaining shall be applied to any other indebtedness owed
> by Jason R. Wylie to Kathy Sullivan.[56]

The Wylie's Rental Note was signed by both Jason and Kathleen. Jason signed both on behalf of

Wylie's Rental and individually, on a single signature line, in this way:

> Payer: Wylie's Rental & Excavating Inc.
>
> _____
> Jason R. Wylie, President
> And Jason R. Wylie, individually[57]

Kathleen contends that Jason was personally liable to her under the Wylie's Rental Note,

either as a direct obligor or as a guarantor of payment by Wylie's Rental. The Trustee disputes

this.

Kathleen's argument is based on her view of the language in the Wylie's Rental Note, and

also on her trial testimony and that of Jason. They each testified that their intent was, and belief

---

[55] *Id.*

[56] *Id.*

[57] *Id.*

is, that Jason was personally liable to Kathleen to pay the Wylie's Rental Note.[58]

Kathleen argues that this testimony is admissible, and is not barred by the parol evidence rule, even if the Court views the language of the Wylie's Rental Note as unambiguously favoring the Trustee's position, based on a so-called "stranger to the contract" exception to the parol evidence rule. Under Michigan's parol evidence rule, "'where a contract is clear and unambiguous, parol evidence of negotiations cannot be admitted to vary the contract.'" *BRB Printing, Inc. v. Buchanan*, 878 F. Supp. 1049, 1051 (E.D. Mich. 1995) (quoting *Goodwin v. Coe Pontiac*, 220 N.W.2d 664, 668 (Mich. 1974)). But an exception to this rule is that "a stranger to a contract cannot use the parol evidence rule." *Id.* at 1052 (citation omitted); *see also Denha v. Jacob*, 446 N.W.2d 303, 306 (Mich. Ct. App. 1989) ("[T]he parol evidence rule cannot be invoked either by or against a stranger to the contract."). Courts generally view a bankruptcy trustee bringing a fraudulent transfer action as such a "stranger to the contract." *See, e.g.*, *Alberts v. HCA Inc.* (*In re Greater Se. Cmty. Hosp. Corp.*), 365 B.R. 315, 318-19 (Bankr. D.D.C. 2007).

The testimony of Jason and Kathleen did not concern any negotiations that preceded the making of the Wylie's Rental Note, but the parties have argued as if the parol evidence rule could bar the testimony of Jason and Kathleen about the Wylie's Rental Note's meaning, absent some exception. Within that framework, Kathleen would have the Court allow the testimony under the "stranger to the contract" exception to the parol evidence rule.

The Trustee contends that Jason was not personally liable under the Wylie's Rental Note. The Trustee contends that only Wylie's Rental, a corporate entity separate from Jason, was liable

---

[58]  *See* Tr. of testimony of Jason Wylie (Docket # 153) at 248-49; Tr. of testimony of Kathleen Sullivan (Docket # 153) at 159-60, 189-90, 219-20.

to Kathleen under the Note, and that the Note unambiguously means this.  The Trustee further argues that the "stranger to the contract" rule does not apply here, and that the testimony of Kathleen and Jason is not credible in any event.

The Court deems the testimony admissible, and has considered it, and has considered how much weight to give it.

Kathleen calculates that the amount due to her under the Wylie's Rental Note, as of August 19, 2019 when the "Mutual Release in Full" was executed, was $195,807.43.[59]  In his post-trial briefs, the Trustee does not dispute that this was the amount of the debt owing by Wylie's Rental.  Kathleen further contends that this alleged debt of Jason to Kathleen should be counted as one of Jason's debts that was released by the "Mutual Release in Full" agreement of the parties.  The Trustee disputes this.

The Court finds and concludes as follows:

1.  The Wylie's Rental Note unambiguously means that only Wylie's Rental was indebted to Kathleen, and that Jason was not.

2.  The testimony of Jason and Kathleen about what their intent was, and what their belief is, on this subject is admissible, and the Court has considered it, based on the "stranger to the contract" rule.  But the Court is not required to find the testimony credible and to believe it, particularly in the face of contrary evidence, including the language of the Wylie's Rental Note itself.

3.  The Court finds that neither Jason's testimony nor Kathleen's testimony about their intent and belief on this subject is credible.  The Court does not believe that testimony.

The foregoing findings and conclusions are supported by the following.

_____

[59]  *See* Def.'s Post-Trial Br. (Docket # 141) at pdf p. 12.

First, the testimony of Kathleen, that her intent and belief was that Jason was personally liable to her under the Wylie's Rental Note, along with Wylie's Rental, obviously is self-serving; Kathleen has a direct financial interest in this issue.

Second, the similar testimony of Jason is suspect, because Jason has an obvious desire to help his mother Kathleen in this case.

Third, numerous provisions in the Wylie's Rental Note, quoted above, particularly when taken together, clearly show that all of the parties — Wylie's Rental; Jason; and Kathleen — intended that only Wylie's Rental be liable to pay Kathleen under the Note.

In the Wylie's Rental Note, Wylie's Rental, and only Wylie's Rental, promised to pay Kathleen the $200,000.00 plus interest. In the Wylie's Rental Note's opening sentence, it explicitly stated that promise to pay by Wylie's Rental. And in the second paragraph of the Note, it stated that the monthly payments of principal and interest "shall be paid by Wylie Rental" to Kathleen.[60] The Note said nothing about *Jason* paying the Note, or making any payments on the Note, or guaranteeing Wylie's Rental's payment on the Note.

It is true that Jason signed the Note on behalf of Wylie's Rental and also individually. But at the signature line, only Wylie's Rental was labeled as "Payer," and Jason was not. Jason had to sign the Note individually only because of the Life Insurance Collateral Provision, quoted above. It was necessary for both Jason, individually, and Kathleen to sign off on that provision, because its terms concerned collateral (a life insurance policy) that Jason was providing

---

[60] DX-D.

individually.[61]

There is no language in the Wylie's Rental Note in which Jason individually promised to pay Kathleen any of the principal or interest on the Note, or in which Jason personally guaranteed payment of the Note by Wylie's Rental. The only words obligating payment of the Note were those obligating Wylie's Rental, as quoted above. And there was no other document by which Jason guaranteed the Wylie's Rental Note.[62]

Moreover, as is clear from the Life Insurance Collateral Provision in the Wylie's Rental Note, and also from Jason's testimony, the Wylie's Rental Note was in fact "backed" by the life insurance polity on Jason's life.[63] So Jason had no unperformed obligation under that provision.

In the Court's view, the clear terms of the Wylie's Rental Note itself show that neither Jason nor Kathleen intended that Jason be liable under that Note. And even if that Note could be viewed as ambiguous on that issue, the Court is persuaded by the language in the Note that Jason and Kathleen did not intend for Jason to be personally liable under the Note. The Court so finds, based on a preponderance of the evidence. To the extent Jason and Kathleen testified to a different intent, the Court finds that testimony unpersuasive and not credible, and the Court does not believe it.

---

[61] In her testimony, Kathleen acknowledged that under this provision in the Wylie's Rental Note Jason provided her with collateral in the form of a life insurance policy on Jason's life. (*See* Tr. of testimony of Kathleen Sullivan (Docket #153) at 138, 142, 147).

[62] Tr. of testimony of Jason Wylie (Docket # 153) at 239.

[63] *See* DX-D ("This Promissory Note is backed by a Life Insurance Policy in the event of the death of Jason Wylie"). In his testimony, Jason confirmed that there was such a life insurance policy that he took out in favor of Kathleen. (*See* Tr. of testimony of Jason Wylie (Docket # 153) at 235). In her testimony, Kathleen did not dispute this.

Because the debt under the Wylie's Rental Note was a debt of the corporation Wylie's Rental only, it was not a debt of Jason individually. And there is no valid basis shown by any evidence or argument in this case for piercing the corporate veil and holding Jason liable for the debt of the corporation Wylie's Rental. *See generally Energy Conversion Devices Liquidation Trust v. Ovonyx, Inc.* (*In re Energy Conversion Devices, Inc.*), 621 B.R. 674, 731-32 (Bankr. E.D. Mich. 2020) (citations omitted):

> "It is well-settled that Michigan courts will respect the separate existence of business entities from their owners. This is true even when a single shareholder or member owns the entity." *Alpha Inv., L.L.C. v. Alpha Real Estate, L.L.C.*, No. 291939, 2010 WL 4977902, at *3 (Mich. Ct. App. Dec. 7, 2010) (citations omitted) . . . .
> . . . .
> In *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. LTD*, 475 F.3d 783, 798 (6th Cir. 2008), the Sixth Circuit Court of Appeals, applying Michigan law, explained:
>
>> "Under Michigan law, there is a presumption that the corporate form will be respected. *Seasword v. Hilti*, 449 Mich. 542, 537 N.W.2d 221, 224 (1995) (citing *Herman v. Mobile Homes Corp.*, 317 Mich. 233, 26 N.W.2d 757, 761 (1947)). "This presumption, often called the 'corporate veil,' may be pierced only where an otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some overriding public policy.'" *Id*. (alteration in original) (quoting *Wells v. Firestone*, 421 Mich. 641, 364 N.W.2d 670, 674 (1984)). Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss."

For the foregoing reasons, the Court finds and concludes that Jason had no debt in any

amount to Kathleen under the Wylie's Rental Note.

**f. Jason's alleged debt to Kathleen for $99,000.00 in treble damages, for conversion**

Kathleen argues that at the time of the "Mutual Release in Full" in August 2019, Jason owed her $99,000.00, as treble damages for Jason's conversion of $33,000.00 taken out of Kathleen's bank account without permission. The treble damages are based on Michigan's statutory conversion statute, Mich. Comp. Laws § 600.2919a.

Kathleen testified that in June 2017, at a time when Jason had access to Kathleen's bank account due to a power of attorney,[64] Jason took $43,000.00 from Kathleen's bank account. According to Kathleen, Jason had asked her to borrow $10,000.00, to which Kathleen agreed, but then Jason actually took $43,000.00 from Kathleen's bank account, without her permission and without telling her. Jason later paid Kathleen back the $10,000.00 he had borrowed from her, but not the additional $33,000.00 that Jason took without permission.[65]

Based on this, Kathleen contends that Jason owed her not just the $33,000.00 he took, but rather a total of $99,000.00, as treble damages under the Michigan conversion statute. That statute provides, in pertinent part,

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> (a) Another person's stealing or embezzling property or converting property to the other person's own use.

---

[64] PX-22.

[65] *See* Tr. of testimony of Kathleen Sullivan (Docket # 153) at 102, 154-57 197-98; PX-25 at items 9, 10; *see also* Tr. of testimony of Jason Wylie (Docket # 153) at 222. Jason testified that he obtained this $43,000 from Kathleen's bank account, and used it in his farming operation. (*See* Tr. of testimony of Jason Wylie (Docket # 154) at 96-97).

28

Mich. Comp. Laws Ann. § 600.2919a.

The Trustee disputes that Jason owed Kathleen this claimed $99,000.00 treble damages debt, but the Trustee's arguments are not persuasive. In his opening post-trial brief, the Trustee argues that "[t]here was no testimony of any agreement to repay the money that was stolen nor was any agreement reduced to writing for repayment."[66] In his post-trial reply brief, the Trustee argues that "[t]here was no evidence of [Jason's liability for this $99,000.00 in treble damages], no testimony as to the necessary elements of a statutory conversion claim, no threat or prosecution of a statutory conversion claim, and no expert opinion as to the validity of a statutory conversion claim."[67]

In order for Kathleen to have had a valid statutory conversion claim, there is no requirement that Kathleen and Jason made any agreement, written or oral, for Jason to repay the $33,000.00 that he took without permission. Nor is it necessary for Kathleen to have threatened to prosecute Jason, or to have filed suit against him. Nor is it necessary for Kathleen to present any "expert opinion as to the validity of a statutory conversion claim." If the evidence presented shows the necessary elements for a statutory conversion claim, then Jason owed a debt to Kathleen based on that claim.

A statutory claim for conversion under Mich. Comp. Laws Ann. § 600.929a(1)(a) requires proof of the following elements: (1) the same elements that exist for common law conversion under Michigan law, namely, "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein;" plus (2) "the

---

[66] Trustee's Post-Trial Br. (Docket # 142) at pdf p. 9.

[67] Trustee's Post-Trial Reply Br. (Docket # 147) at pdf p. 2.

29

defendant employed the converted property for some purpose personal to the defendant's interests." *See Aroma Wines & Equip. Inc. v. Columbian Distrib. Servs., Inc.*, 871 N.W. 2d 136, 138, 141, 148 (Mich. 2015) (footnote omitted).

There are at least two possible defenses that Jason may have had to Kathleen's treble damages claim, which are discussed below. But first, the Court notes that the evidence in this case shows that when Jason took the $33,000.00 from Kathleen's bank account, without her permission or knowledge, he wrongfully exerted dominion over Kathleen's personal property, and that he employed that converted property for a purpose personal to Jason's own interests, namely use in his farming operation. The evidence therefore establishes, subject to possible defenses, that Jason was liable to Kathleen for treble damages under the conversion statute. The amount of such damages is easy to determine: it was the $33,000.00 wrongfully taken, trebled, *i.e.*, $99,000.00.

It is true that Kathleen never filed suit against Jason on her statutory conversion claim. But that does not mean that her claim did not exist. And at the time the parties made their "Mutual Release in Full" agreement in August 2019, Kathleen's statutory conversion claim was not yet time barred. The claim accrued, at the earliest, in June 2017, when Jason took the money. Under Michigan law, there is a three-year statute of limitations for such a conversion claim. *See Tillman v. Great Lakes Truck Ctr., Inc*., 742 N.W.2d 622, 623-24 (Mich. Ct. App. 2007); *Gregory J. Reed & Assocs., PC v. Turner* (*In re Estate of Franklin*), No. 364036, 2024 WL 1689180, at *9-10 (Mich. Ct. App. Apr. 18, 2024). So the claim was not time barred as of August 2019.

There are two possible defenses that Jason arguably may have had to Kathleen's treble

damages claim, that are apparent from the record in this case, but neither of which the Trustee

has argued.  The first of these is an argument that in some circumstances, at least, Michigan law

does not recognize a cause of action for conversion when the property wrongfully taken is

money.  For example, this Court cited a decision of the United States Court of Appeals for the

Sixth Circuit, in *McCallum v. Pixley* (*In re Pixley*), 504 B.R. 852, 865 n.12 (Bankr. E.D. Mich.

2014), as follows:

> [In] *Carpenters' Pension Trust Fund Detroit & Vicinity v.*
> *Laminate Creations*, 803 F.2d 718 (unpublished table decision),
> 1986 WL 17726, at *2, (6th Cir. 1986) . . . the Court stated:
>
>> [I]t is a settled principle of Michigan tort law that
>> 'an action for conversion of money is not
>> maintainable unless there is an obligation on the
>> part of the defendant **to return or apply the**
>> **specific money entrusted to his care**.'  'Though
>> money is property which it is often difficult to
>> identify, it is well settled that an action of trover
>> will lie for its conversion when such identification
>> is possible, and there is an obligation to deliver the
>> specific money in question.'
>
> (Emphasis added) (citations omitted).

Similarly, in *Citizens Ins. Co. of Am. v. Delcamp Truck Ctr., Inc.*, 444 N.W. 2d 210, 213 (Mich.

Ct. App. 1989) (citations omitted), the Michigan Court of Appeals held:

> Although an action cannot be maintained for conversion of money
> unless there is an obligation on the part of the defendant to return
> the specific money enrusted to his care, *Garras v. Bekiares*, 315
> Mich. 141, 148, 23 N.W.2d 239 (1946), it is not necessary that the
> money should be specifically earmarked for its return. The
> defendant must have obtained the money without the owner's
> consent to the creation of a debtor and creditor relationship. See
> *Hogue v. Wells*, 180 Mich. 19, 24, 146 N.W. 369 (1914); 89 C.J.S.,
> Trover and Conversion,§ 23, p. 541. . . .

> An action for conversion lies where an individual cashes a check and retains the full amount of the check when he is entitled to only a portion of that amount.

In this case, the Trustee has made no argument that Kathleen's conversion claim was invalid as a claim of conversion of her money, based on the reasoning of the foregoing cases. The Trustee therefore has forfeited any such argument.

In addition, had the Trustee made such an argument, the Court likely would have ruled against the Trustee, for at least two reasons: (1) because Kathleen's claim for conversion of money was the type of claim that is cognizable, under the reasoning of the foregoing cases; and (2) because Kathleen could have responded to such an argument by the Trustee, in part, by arguing that she still had a cause of action against Jason for treble damages under the Michigan conversion statute, for *theft* or *embezzlement* of her bank account funds. Section 600.2919a(1)(a) awards treble damages not just for conversion, but also for "stealing or embezzling property," and Michigan courts have recognized that stealing and embezzling are separate statutory grounds for treble damages. *See Aroma Wines,* 871 N.W. 2d at 141 n.18 (noting that the statute provides for treble damages for "stealing" and "embezzling," not just for conversion); *Shiffman v. Auto Source Wholesale, LLC*, No. 339291, 2018 WL 3863471, at *2-3 (Mich. Ct. App. Aug. 14, 2018) (finding the defendant liable for treble damages under § 600.2919a(1)(a) for "stealing" $250,000 from the plaintiff).[68]

---

[68] The Michigan Court of Appeals in *Shiffman* defined "stealing" as "the criminal taking of personal property either by larceny, embezzlement, or false pretenses." *Id.* at *3 (citations omitted).

Michigan courts have defined "embezzlement" as "'the application to the party's own use of property which came into his hands, under trust, by reason of his employment in a particular capacity; and the misapplication of it from the purpose for which he received it.'" *People v. Bergman*, 224 N.W. 375, 376 (Mich. 1929) (citations omitted).

A second possible defense that Jason arguably may have had to Kathleen's treble damages claim is based on an agreement between Jason and Kathleen, under which Jason made up for taking the $33,000.00, at least in part, by letting Kathleen use a truck for several months. Kathleen testified that Jason agreed to buy a truck for Kathleen to own and drive, to make up for taking the $33,000.00. But then she testified that Jason merely "was going to pay me [$]33,000 by buying a truck and letting me drive it." She further testified that Jason let her drive a 2018 Silverado pickup that Jason owned and that was subject to a lien. And, she testified, she had that truck "from March until August of 2018," and then the truck "got in [a] wreck, [and] got repossessed."[69]

Kathleen states in her post-trial brief that her use of this truck "was ended by a collision that rendered it unusable after five or six months," and she argues that "except for the value of the use of the truck for five or six months, [the treble damages] was therefore still owed."[70]

The problem with the possible defense, based on this agreement for Kathleen's use of a truck, is that the Trustee did not argue this defense himself. He made no effort to develop and brief this defense in his post-trial briefs, and made no effort to develop the evidence to support this defense at trial, after Kathleen testified about this matter. For example, there is no evidence or argument by the Trustee about any of the following: (1) what was the value of Kathleen's use of this truck for five or six months?; (2) how should that value affect the amount of Kathleen's treble damages claim, if at all? (*e.g.*, should that value amount be deducted from the $33,000.00 damage amount, and the resulting amount then be trebled?; *e.g.*, should that value amount

---

[69]   *See* Tr. of testimony of Kathleen Sullivan (Docket # 153) at 198, 156.

[70]   Def.'s Post-Trial Br. (Docket # 141) at pdf p. 14.

33

instead be deducted from the full $99,000.00 amount?); (3) was the parties' agreement for Kathleen's use of this truck a full, or even partial, settlement of Kathleen's treble damages claim?; and (4) if so, what was the legal impact, if any, on the settlement when the truck was rendered unusable after only a few months?

Because the Trustee did not argue or brief any of these issues, and did not present any evidence about them, the Court must disregard any possible defense the Trustee might have had based on Jason's giving Kathleen the use of Jason's truck. In the face of Kathleen's proof of the conversion claim, the Trustee bore the burden of proof on the issues just identified, as part of his burden of proving, by a preponderance of the evidence, that Jason did not receive reasonably equivalent value for his transfer of the three pieces of real estate to Kathleen.

For the foregoing reasons, the Court finds that just prior to entering into the "Mutual Release in Full" transaction with Kathleen in August 2019, Jason owed a debt to Kathleen of $99,000.00 for treble damages, for Jason's conversion of Kathleen's $33,000.00, under the Michigan conversion statute, Mich. Comp. Laws § 600.2919a.

### g. The total amount of debt

For the reasons discussed above, the Court finds that Jason's debts to Kathleen, just prior to the parties entering into the August 12, 2019 "Mutual Release in Full" agreement, totaled $836,516.12:

| | |
|---|---|
| $500.000.00 | Amended Mortgage Note, secured by mortgage on the 7575 N. Territorial property |
| $237,516.12 | 6600 Gregory Note, secured by mortgage on the 6600 Gregory property |
| $99,000.00 | statutory conversion claim for treble damages |
| **$836,516.12** | Total |

### 3. The total amount of Jason's debt to Kathleen that was released in the August

**2019 transaction**

The parties disagree about whether Kathleen released all of Jason's foregoing debts in the August 2019 transaction. The release of debt was done by the August 12, 2019 agreement entitled "Mutual Release in Full," discussed in Part III.A.1 of this Opinion, above. In that agreement, which was drafted by attorney Thomas R. Morris, Kathleen released Jason from debts using the following language:

> FOR THE SOLE AND ONLY CONSIDERATION OF the delivery of three Quitclaim Deeds in Lieu of Foreclosure, the receipt of which is hereby acknowledged by **Kathleen Sullivan,** of 805 East Blanco, Aztec, NM 87410 ("Mortgagee"), the Mortgagee hereby releases and discharges **Jason Wylie,** an individual, whose address is 7348 Gregory Road, Dexter, Michigan 48130 ("Mortgagor"), from any and all claims of any kind or character related to the Mortgages and Promissory Notes dated January 17, 2011, January 27, 2011, June 18, 2014 and any renewals or modifications thereof, as executed by the Mortgagor, and Mortgagee hereby acknowledges full settlement and satisfaction of all claims associated with the said Mortgages and Promissory Notes. Mortgagee retains the right to foreclose any or all of said Mortgages, but this release is intended to release Mortgagor from any liability for any deficiency following a foreclosure sale.[71]

The Trustee agrees that under this release language, Kathleen released Jason's debt on the Amended Mortgage Note, secured by the mortgage on the 7575 N. Territorial property, and Jason's debt on the 6600 Gregory Note, secured by the mortgage on the 6600 Gregory property.[72] The Court has found that these debts total $737,516.12 ($500,000.00 plus $237,516.12), as discussed above.

The Trustee disputes Kathleen's argument that the release also released Kathleen's

---

[71] DX-M (bold in original).

[72] *See* Trustee's Post-Trial Br. (Docket # 142) at pdf pp. 6-8, 11.

$99,000.00 treble damages claim for conversion. Kathleen, on the other hand, argues that the release was a release of all of Jason's then-existing debts to her, including the treble damages claim, and that Kathleen and Jason both intended that result.

For the following reasons, the Court agrees with the Trustee, and finds that Kathleen did not release Jason from her $99,000.00 treble damages claim for conversion.

The "Mutual Release in Full" was a limited release, not a general release. It released Jason only from "any and all claims of any kind or character related to the Mortgages and Promissory Notes" listed in the agreement, which listed three specific sets of such mortgages and promissory notes. The agreement also contained Jason's acknowledgment of the "full settlement and satisfaction of all claims associated with the said Mortgages and Promissory Notes."

Kathleen's $99,000.00 treble damages claim against Jason was not covered by the release language; it was not listed, described, or referred to in that language. It was not a "claim . . . related to the Mortgages and Promissory Notes" listed. Nor was it a claim "associated with the said Mortgages and Promissory Notes." As described in Part III.A.2.f of this Opinion, above, Kathleen's conversion claim arose in June 2017 when Jason took, without permission, $33,000.00 from Kathleen's bank account. That action by Jason was unrelated to any mortgage or promissory note. And it certainly was unrelated to any of the three specific sets of mortgages and promissory notes listed in the "Mutual Release in Full." As the release stated, those documents were ones "dated January 17, 2011, January 27, 2011, and June 18, 2014, and any renewals or modifications thereof." None of those mortgages or promissory notes were renewed or modified at or anywhere near the time of Jason's action in taking the $33,000.00, which occurred years later, in June 2017. For example, the Amended Mortgage Note, secured by the

36

mortgage on the 7575 N. Territorial property, modified the original note signed January 17, 2011, and the Amended Mortgage Note was dated and signed on February 22, 2014.[73]  It was never amended after February 22, 2014.  The 6600 Gregory Note, secured by the mortgage on the 6600 Gregory property, was dated and signed on June 17, 2014.[74]  It was never amended after that date.

In addition, as the Trustee points out, the "Mutual Release in Full" contained the following provisions, just before the signatures of Kathleen and Jason:

> All agreements and understandings between the parties hereto are embodied and expressed herein, and the terms of this Mutual Release are contractual and not a mere recital.

> THE UNDERSIGNED HAVE READ THE FOREGOING MUTUAL RELEASE IN FULL AND FULLY UNDERSTAND IT.[75]

In the Court's view, the language of the "Mutual Release in Full" agreement, quoted above, clearly and persuasively shows that Kathleen did ***not*** release Jason from her $99,000.00 treble damages conversion claim.

In reaching this conclusion, the Court has considered all of the testimony given at trial. This includes the testimony of Kathleen and Jason.  Kathleen testified that she intended and understood the "Mutual Release in Full" agreement to release ***all*** debts that Jason had to Kathleen at the time.[76]

---

[73]  *See* Part III.A.2.a and footnote 9 of this Opinion.

[74]  *See* Part III.A.2.b and footnote 9 of this Opinion.

[75]  DX-M at pdf p. 1 (capitalization in original).

[76]  *See* Tr. of testimony of Kathleen Sullivan (Docket # 153) at 149-50, 152, 197; (Docket # 154) at 87-89.

The testimony of Jason differed from Kathleen's testimony. Jason admitted that the release language in the "Mutual Release in Full" was "very specific as to what's being released," and that what it released was the promissory notes and mortgages for the 6600 Gregory property, the 7575 N. Territorial property, the 6401 Mast property, and also the Wylie's Rental Note.[77] Instead of relying on the "Mutual Release in Full" agreement, Jason testified that he had an agreement with Kathleen, separate and apart from the "Mutual Release in Full" agreement, that in exchange for his transfers of the three pieces of real estate to Kathleen, all of Jason's debts would be released. This is so, Jason testified, "[d]espite what [the 'Mutual Release in Full'] said."[78] But Kathleen did not testify that there was any other agreement, written or oral, by which Kathleen released debts owed by Jason, other than the written "Mutual Release in Full" agreement. And the integration clause in that agreement is inconsistent with there being any other agreement. As quoted above, that clause said that "[a]ll agreements and understandings between the parties hereto are embodied and expressed herein[.]"[79] The Court finds that there was no such other agreement.

The Court finds that both the self-serving testimony of Kathleen, and the biased testimony of Jason which contradicted Kathleen's testimony, are not credible, and the Court does not believe it. The language of the "Mutual Release in Full" is clearly contrary to the testimony

---

[77] Tr. of testimony of Jason Wylie (Docket # 153) at 241. As discussed in Part III.A.2.c of this Opinion, it is undisputed that Jason's liability on the promissory note and the mortgage for the 6401 Mast property had already been released, and the mortgage discharged, in June 2014. And as the Court has found in Part III.A.2.e of this Opinion, Jason was never personally liable on the Wylie's Rental Note.

[78] *See* Tr. of testimony of Jason Wylie (Docket # 153) at 244-45.

[79] DX-M at pdf p. 1.

of both Kathleen and Jason, and the Court finds that language much more persuasive than the testimony of Kathleen and Jason on this issue.

Given the language of the agreement, Kathleen cannot now credibly claim that she thought it meant something other than, or more than, what it clearly means. And as noted above, in signing the August 12, 2019 "Mutual Release in Full" agreement, Kathleen and Jason both stated, in capital letters, that they "HAVE READ THE FOREGOING MUTUAL RELEASE IN FULL AND FULLY UNDERSTAND IT."[80]

Kathleen argues that the "related to" language in the release is broad enough to sweep in all of Jason's debts to Kathleen, including even Jason's debt to Kathleen for the June 2017 conversion. This is so, Kathleen argues, because Jason took the $33,000.00 from Kathleen's bank account, without her permission, in order to use it for his farming operations, and because *some* of the money taken from her account had been put there in the first place by Jason making payments to her under the 6600 Gregory Note and/or by Wylie's Rental making payments under the Wylie's Rental Note.[81] According to Kathleen, that makes the June 2017 conversion debt "related to" one or more of the three specific sets of promissory notes and mortgages listed in the release, none of which are dated after 2014, because those notes and mortgages also were related to Jason's farming operations. Kathleen's argument is unpersuasive. It stretches the "related to" language far beyond what is plausible and reasonable in this context.

Kathleen's attorney in this case, Thomas R. Morris, was the drafter of the "Mutual

---

[80] *Id.* at pdf pp. 1-2.

[81] *See* Def.'s Post-Trial Br. (Docket # 141) at pdf p. 17; *see also* Tr. of testimony of Kathleen Sullivan (Docket # 154) at 87-89.

Release in Full" agreement.  He represented Jason in connection with that agreement.[82]  He testified at trial, and his testimony actually supports the Trustee's position.

As he stated in the post-trial brief he filed for Kathleen, Mr. Morris testified that at the time he drafted the agreement, he was aware of Jason's "real estate purchases and the Wylie's Rental [N]ote, but not the other debt" of Jason to Kathleen.[83]  He testified that at the time, he failed to understand "that other debt was owed."[84]  That is one of the two reasons why he says he drafted the agreement "in a format that referred to specific notes (and related debt) rather than all debt in existence."[85]

This testimony essentially supports the Trustee's position, and the Court's finding, that the release did not release Kathleen's conversion claim.  It shows that the attorney who drafted the agreement did not even know of Jason's $99,000.00 debt to Kathleen for conversion, and did not draft the agreement to release such "other debt" that Jason owed to Kathleen.

Further support for the Trustee's position comes from the second reason why attorney Morris says he drafted the release the way he did.  That reason is that he had represented to Kathleen that "the documents used for the transaction would be in the same form as those used to surrender land to the Sullivan family members who had independent representation."[86]  He cited

---

[82]  At the time he drafted this agreement, attorney Morris represented Jason, and did not represent Kathleen.  (*See* Tr. of testimony of Thomas R. Morris (Docket # 154) at 31, 56.)

[83]  Def.'s Post-Trial Br. (Docket # 141) at pdf p. 19.

[84]  *Id.* at pdf p. 18; *see also* Tr. of testimony of Thomas R. Morris (Docket # 154) at 46.

[85]  Def.'s Post-Trial Br. (Docket # 141) at pdf p. 18.

[86]  *Id.* at pdf pp. 18-19; *see also* Tr. of testimony of Thomas R. Morris (Docket # 154) at 35-36, 45.

DX-J as an example of that format.[87]  That was an agreement between Jason and his stepfather, Christopher Sullivan, which had been drafted by a different attorney, Dennis Valenti.  That agreement too included only a limited release, rather than a general release, by which Christopher Sullivan released Jason from debt under a specific mortgage note and mortgage, in exchange for Jason's transfer of the subject property to Christopher Sullivan.  From attorney Morris's representations to her, as well as from the language of the document itself, Kathleen therefore was well aware of this limited-release format when she reviewed, understood, and signed the August 12, 2019 "Mutual Release in Full" agreement.

For these reasons, the Court finds and concludes that under the August 12, 2019 "Mutual Release in Full" agreement, Kathleen released Jason from a total of $737,516.12 in debt, and no more.

### 4. The value of the 6401 Mast property and the other two pieces of real estate that Jason transferred to Kathleen in the August 2019 transaction

At trial, the Trustee presented expert testimony regarding the value, as of August 2019, of the three pieces of real estate that Jason transferred to Kathleen, in the August 2019 "Mutual Release in Full" transaction.  Based on that testimony, the Trustee argues that the properties had the following values:

| | |
|---|---|
| 6401 Mast property | $380,000.00 |
| 7575 N. Territorial property | $316,000.00 |
| 6600 Gregory property | $232,000.00 |
| **Total**: | **$928,000.00**[88] |

Kathleen did not present any expert witness of her own regarding the value of any of the

---

[87]  Def.'s Post-Trial Br. (Docket # 141) at pdf p. 19.

[88]  *See, e.g.*, Trustee's Post-Trial Br. (Docket # 142) at pdf p. 2.

properties. But she tried to poke holes in the testimony of the Trustee's expert witnesses, and she presented some lay witness testimony about valuation, from herself and from Jason. In her post-trial brief, Kathleen argues that the properties had the following values:

| | |
|---|---|
| 6401 Mast property | $320,000.00 |
| 7575 N. Territorial property | $278,000.00 |
| 6600 Gregory property | $207,000.00 |
| **Total**: | **$805,000.00**[89] |

The Court notes that even if it were to accept Kathleen's valuations, that would mean that the $805,000.00 in value of the real estate that Kathleen received in the August 2019 transaction *exceeded* the $737,516.12 amount of debt reduction that she gave Jason in exchange, by $67,483.88.

But the Court finds that the value of the real estate that Jason transferred to Kathleen was higher than the $805,000 amount Kathleen argues. As explained below, the Court finds that the total value of the three pieces of real estate that Jason transferred to Kathleen in the August 2019 transaction was $893,000.00. That amount *exceeds* the $737,516.12 amount of debt reduction that Kathleen gave Jason in exchange, *by $155,483.88.*

The Court will discuss the value of each of these properties. Initially the Court notes that, contrary to Kathleen's post-trial briefing about values, Jason testified that the total value of these three properties was "[c]lose to a million bucks."[90]

**a. The 6401 Mast property**

The Trustee offered the expert testimony of Michael T. Williams to prove what the value

---

[89] *See, e.g.,* Def.'s Post-Trial Br. on Valuation (Docket #143) at pdf p. 8.

[90] *See* Tr. of testimony of Jason Wylie (Docket # 153) at 253.

of the 6401 Mast property was when Jason transferred it to Kathleen on August 19, 2019. Mr.

Williams is a licensed and well-qualified expert in appraising properties like the 6401 Mast

property. He did an appraisal, wrote a detailed appraisal report, and testified.[91] As noted in Part

III.A.1, footnote 7 of this Opinion, this property is roughly 80 acres of farmland. Mr. Williams

testified that in his opinion, the value of the 6401 Mast property was $380,000.00 as of August

19, 2019.[92] This is a rounded number, based on 79.63 gross acres at a value of $4,800.00 per

acre.[93]

Kathleen contends that the Court should consider the value to be no more than $4,000.00

per acre, which she says equates to a total value of $320,000.00.[94]

Mr. Williams admitted that his written appraisal contains an error, which the Court finds

important. Mr. Williams's appraisal considered the sale of six properties that he considered

comparable to the 6401 Mast property. The report listed the six comparable sales, and made

various adjustments to account for differences from the 6401 Mast property, to arrive at an

adjusted price per acre for each comparable. The adjusted prices per acre listed in the appraisal

---

[91] Mr. Williams's appraisal report for the 6401 Mast property is PX-30. The report itself was not admitted into evidence, but Mr. Williams testified from and about the report in detail, without objection, and was cross-examined about the report at length. (*See* Tr. of testimony of Michael T. Williams (Docket # 153) at 49-91 (direct and cross-examination testimony regarding value of the 6401 Mast property)).

[92] *See* Tr. of testimony of Michael T. Williams (Docket # 153) at 53.

[93] The $380,000.00 number is rounded; actually, 79.63 gross acres times $4,800.00 per acre equals a total value of $382,224.00. The term "gross acres" is applied here because, according to Mr. Williams, the 79.63 acres "probably includes some road right of way." Tr. of testimony of Michael T. Williams (Docket # 153) at 50, 58.

[94] *See* Def.'s Post-Trial Br. on Valuation (Docket # 143) at pdf pp. 4-7, 8. This $320,000.00 number is obviously rounded as well, since 79.63 gross acres times $4,000.00 per acre equals a total value of $318,520.00.

report for the comparable sales were:

Sale 1    $4,100.00 per acre
Sale 2    $4,500.00 per acre
Sale 3    $6,500.00 per acre
Sale 4    $4,700.00 per acre
Sale 5    $4,400.00 per acre
Sale 6    $4,100.00 per acre[95]

The report then calculated that the average adjusted price for these six comparable sales was

$4,700.00 per acre.[96]  But there is an error.  As Mr. Williams admitted, the adjusted price per acre

for Sale 3 is based on a typographical error in the appraisal report, and it should be $5,645.00,

not $6,500.00.[97]  Using the lower price per acre for Sale 3, the correct average of the six

comparable sales is $4,574.00 per acre, not $4,700.00 per acre.[98]

This correction affects the reasoning Mr. Williams used to reach his valuation.  The

summary reasoning for his valuation of $380,000.00 is the following.  In this quotation, the Court

has italicized the two excerpts that are incorrect:

**Summary**

The adjusted sales range from $4,100 to *$6,500*, with an average of
$4,700 per acre.  Sale 1 sets the lower end of the range, while Sale
3 sets the upper end.  Omitting these two, and the average is about
$4,400 per acre.  Sales 1, 3, 4, and 6 were acquired for continued
agricultural dedication, and together they average about *$4,900 per
acre*.  Based upon the data, we consider a market value of $4,800
per acre to be reasonable for application to the subject.

---

[95]  PX-30 (Docket # 136-2) at pdf p. 3.

[96]  *Id.*  This is a rounded number; the actual average of these numbers is $4,716.67 per acre.

[97]   *See* Tr. of testimony of Michael T. Williams (Docket # 153) at 72-73.

[98]  *Id.* at 74.

Thus,

79.63 gross acres    @    $ 4,800    =    $380,000 (rounded)

Concluding, it is the appraisers' opinion that the retrospective
'as-is' market value of the fee simple title to 79.63 gross acres,
partially encumbered by a conservation easement, as of August 19,
2019, was:

**Three Hundred Eighty Thousand ($380,000) Dollars**.[99]

The sentence quoted above, which states:

Sales 1, 3, 4, and 6 were acquired for continued agricultural
dedication, and together they average about *$4,900 per acre*.

should instead state this:

Sales 1, 3, 4, and 6 were acquired for continued agricultural
dedication, and together they average ***$4,636 per acre.***

Based on this correction, in the Court's view, the summary reasoning of Mr. Williams's

appraisal should have used a per acre price of $4,636.00 per acre, not $4,800.00. That lower

price per acre yields a value of $370,000.00 (rounded up from $369,164.68).[100]

Except for the need to make this correction, the Court finds Mr. Williams's detailed

testimony and expert opinion persuasive, and finds that the value of the 6401 Mast property as of

August 19, 2019 was $370,000.00. The Trustee has proven that value by a preponderance of the

evidence.

The Court is not persuaded by Kathleen's arguments for a lower value, or by her

criticisms of Mr. Williams's appraisal. And the Court gives very little weight to the offhand

---

[99] PX-30 (Docket # 136-2) at pdf pp. 5-6 (bold in original) (italics added).

[100] 79.63 gross acres times $4,636.00 per acre equals $369,164.68.

testimony of Kathleen and Jason regarding the per acre value of the 6401 Mast property or the other two properties that Jason transferred to Kathleen in August 2019.[101] That testimony is little more than speculation, and is unsupported by any comparable sales or any other persuasive facts or data.

Kathleen criticizes a 5% upward adjustment in value that Mr. Williams applied to the 6401 Mast property, compared to sales of comparable properties, because the 6401 Mast property has a paved road running by it, instead of a gravel road like the comparable-sale properties. But the Court finds that Mr. Williams's upward 5% adjustment is appropriate, based on his testimony that a paved road generally increases value.[102] Kathleen presented no evidence to the contrary.

Kathleen also criticizes Mr. Williams's appraisal because Mr. Williams did not make any adjustments in price per acre for the comparable sales for the percentage of tillable land (*i.e.*, land that can be farmed) that those properties had, compared to the 6401 Mast property. Mr. Williams was justified in that approach, however, because the comparable sales that he relied on most heavily had tillable acre percentages roughly comparable to the percentage for the 6401 Mast property. As Mr. Williams testified, roughly 83 percent of the 6401 Mast property is tillable.[103] By comparison, the tillable percentages for comparable property nos. 1, 3, 4, and 6 are,

---

[101] Jason testified that he always thought that a rule of thumb was that "conserved farmland" (*i.e.*, land subject to a conservation easement) in the area of the 7575 N. Territorial property was worth $3,000.00 per acre. (*See* Tr. of testimony of Jason Wylie (Docket # 153) at 252). Kathleen testified that the 7575 N. Territorial property was not worth more than $3,250.00 per acre in August 2019. (*See* Tr. of testimony of Kathleen Sullivan (Docket # 154) at 85-86).

[102] *See* Tr. of testimony of Michael T. Williams (Docket # 153) at 45, 61-62, 80.

[103] *See* Tr. of testimony of Michael T. Williams (Docket # 153) at 74-75; PX-30 (Docket # 136-2 at pdf p. 3).

respectively, 81, 90, 73, and 90 percent.[104]  Mr. Williams testified that he considered these

differences in reaching his overall conclusion about the value of the 6401 Mast property, even

though he did not make specific price per acre adjustments for these differences.[105]  And he

testified that despite these differences, the sale prices of the comparable properties did not show a

consistent pattern of a higher percent tillable property having a higher price per acre.[106]  Kathleen

did not present any evidence to the contrary.

### b. The 7575 N. Territorial property

The Trustee also offered the expert testimony of Michael T. Williams to prove what the

value of the 7575 N. Territorial property was when Jason transferred it to Kathleen on August 19,

2019.  Mr. Williams did an appraisal of this property, wrote a detailed appraisal report, and

testified about it.[107]  As noted in Part III.A.1, footnote 9 of this Opinion, this property is roughly

66 acres of farmland.  Mr. Williams testified that in his opinion, the value of the 7575 N.

Territorial property was $316,000.00 as of August 19, 2019.[108]

At trial, counsel for Kathleen did not question Mr. Williams about this opinion.  Kathleen

did level some criticisms of the opinion in her post-trial brief, namely the same arguments she

---

[104]  *See* PX-30 (Docket # 136-2 at pdf p. 3); *see also* Tr. of testimony of Michael T. Williams (Docket # 153) at 81.

[105]  *See* Tr. of testimony of Michael T. Williams (Docket # 153) at 83.

[106]  *See id*. at 81-82.

[107]  Mr. Williams's appraisal report for the 7575 N. Territorial property is PX-29.  The report itself was not admitted into evidence, but Mr. Williams testified from and about the report in detail, without objection.  (*See* Tr. of testimony of Michael T. Williams (Docket # 153) at 38-49 (direct examination testimony regarding value of the 7575 N. Territorial property)).

[108]  *See* Tr. of testimony of Michael T. Williams (Docket # 153) at 47, 48-49.

47

made about the 6401 Mast property appraisal, regarding tillable acres and the paved road.  The Court finds those criticisms unpersuasive, for the same reasons discussed above in connection with the 6401 Mast property.

The Court finds Mr. Williams's detailed testimony and expert opinion persuasive.  In reaching his opinion about the $316,000.00 value, Mr. Williams considered the 7575 N. Territorial property in two "elements."  Element I is the 62.51 gross acres of the property that are subject to a conservation easement.  Element II is the 3.9 gross acres of the property that are not subject to the conservation easement.[109]

As explained by Mr. Williams, the conservation easement restricts the use of the 62.51 acres to the following:

> Agricultural use, open space, forestry.  You can have a couple of agricultural buildings on it, but it cannot be built with homes.  Some recreational uses are allowed, but for instance, you can't build an athletic field, a soccer field.  You can't build any churches or schools or anything like that.  So strictly agricultural uses, conservation, recreation, open space.[110]

The 3.9 acres that are not subject to the conservation easement are not restricted in this way; rather, they may be used in any way allowed by the applicable zoning laws, including, in this case, farming.[111]

For Element I, Mr. Williams considered the sales of six comparable properties that were

---

[109] *Id.* at 39.

[110] *Id.* at 40.

[111] *See id.* at 39.

subject to conservation easements, and made appropriate adjustments to their prices per acre.[112]

He opined that the value of the Element I property was $225,000.00, and that opinion was based

on the following reasoning:

> **Summary**
>
> The adjusted sales range from $3,200 to $3,900 [per acre], with an average of $3,500 per acre. Sale 5 sets the lower end of the range, while Sale 3 sets the upper end. Omitting these two, and the average remains at $3,500 per acre. Sales 1, 3, 4, and 6 were acquired for continued agricultural dedication, and together they average about $3,600 per acre. Based upon the data, we consider a market value of $3,600 per acre to be reasonable for application to the subject.
> Thus,
>
> 62.51 gross acres @ $ 3,600 = $225,000 (rounded)
>
> Concluding, it is the appraisers' opinion that the retrospective 'as-is' market value of the fee simple title to the subject property, identified herein under Element I, as of August 19, 2019, was:
>
> **Two Hundred Twenty Five Thousand ($225,000) Dollars.[113]**

As for the 3.9 acres in Element II, Mr. Williams considered the sales of five comparable

properties that were not subject to conservation easements, and made appropriate adjustments to

their prices per acre.[114] He opined that the value of the Element II property was $91,000.00, and

that opinion was based on the following reasoning:

---

[112] *See* PX-29 (Docket # 135-2) at pdf pp. 15-17; Tr. of testimony of Michael T. Williams (Docket # 153) at 40, 44-47.

[113] *See* PX-29 (Docket # 135-2) at pdf p. 17 (bold in original); Tr. of testimony of Michael T. Williams (Docket # 153) at 46-47.

[114] *See* PX-29 (Docket # 135-2) at pdf p. 21-23; Tr. of testimony of Michael T. Williams (Docket # 153) at 47-49.

**Summary**

The adjusted sales range in price from $79,000 to $102,700, with an average of $91,620. Sale 2 is at the upper end of the range while Sale 4 sets the lower end. Omitting these two indicators and the range tightens between $82,700 and $101,300, with an average of $92,000. Sale 4 required the least overall adjustment. Sale 1 has a long access leg while Sale 4 is accessed by easement. They set opposing ends of the adjusted range which may [signify] varied degree of influence. Overall, we consider each of the comparable sales to be well representative of demand for single family homesites within the immediate market, with the five sales stretched between the southern and northern regions of the township. Based upon the data, we consider a market value of $91,000 to be appropriate for application to the 3.90 acres.

Concluding, it is the appraisers' opinion that the retrospective 'as-is' market value of the fee simple title in 3.90 acres, identified herein under Element II, as of August 19, 2019, was:

**Ninety [One] Thousand ($91,000) Dollars.**[115]

The Court finds that the value of the 7575 N. Territorial property as of August 19, 2019 was $316,000.00 ($225,000.00 for Element I plus $91,000.00 for Element II). The Trustee has proven that value by a preponderance of the evidence.

**c. The 6600 Gregory property**

As noted in Part III.A.1, footnote 9 of this Opinion, the 6600 Gregory property is roughly 2 acres of land, containing a single family home. The Trustee offered the expert testimony of Dean W. Dryer to prove what the value of the 6600 Gregory property was as of August 9, 2019, close to the time when Jason transferred it to Kathleen on August 19, 2019. Mr. Dryer is a licensed and well-qualified expert in appraising properties like the 6600 Gregory property. He

---

[115] *See* PX-29 (Docket # 135-2) at pdf pp. 23-24 (bold in original); Tr. of testimony of Michael T. Williams (Docket #153) at 48-49.

did an appraisal, wrote a detailed appraisal report, and testified.[116]  Mr. Dryer testified that in his

opinion, the value of the 6600 Gregory property was $232,000.00 as of August 9, 2019.[117]

In her post-trial brief, Kathleen argues, somewhat inconsistently, that the Court should

reduce Mr. Dryer's valuation "by more than $25,000," or "by no less than $25,000," but then

argues in a table in the conclusion of her brief that the Court should value the property at

$207,000, reflecting a $25,000 discount from Mr. Dryer's $232,000 valuation.[118]

In reaching his opinion of value, Mr. Dyer considered the sales of three comparable

properties, and made appropriate adjustments to their prices.[119]  The adjusted prices for the three

comparable sales were $228,000, $237,800, and $227,400,[120] making the average for the three of

$231,067.

The Court finds that Mr. Dryer's valuation of $232,000.00 should be reduced by

$25,000.00.  Mr. Dryer did not inspect the 6600 Gregory property until June 20, 2022; so he did

not inspect the property in or near August 2019.[121]  For this property that is important, because

the evidence shows that the property may have been in a much worse condition in August 2019

---

[116]  Mr. Dryer's appraisal report for the 6600 Gregory property is PX-28 (Docket # 119-30).  The report itself was not admitted into evidence, but Mr. Dryer testified from and about the report in detail, without objection, and was cross-examined about the report at length.  (*See* Tr. of testimony of Dean W. Dryer (Docket # 153) at 15-32 (direct and cross-examination testimony regarding value of the 6600 Gregory property)).

[117]  *See* Tr. of testimony of Dean W. Dryer (Docket # 153) at 15, 16.

[118]  *See* Def.'s Post-Trial Br. on Valuation (Docket # 143) at pdf pp. 2, 4, 8.

[119]  *See* Tr. of testimony of Dean W. Dryer (Docket # 153) at 16; PX-28 (Docket # 119-30).

[120]  *See* PX-28 (Docket # 119-30) at pdf p. 3.

[121]  *See* Tr. of testimony of Dean W. Dryer (Docket # 153) at 17-18.

than it was in when Mr. Dryer inspected the property on June 20, 2022. The 6600 Gregory property had been rented by a tenant for many years, until they were evicted in April 2022, and there is evidence that in April 2022, the tenant had left the property in an "absolutely disgusting" and "atrocious" condition,[122] including, for example, an infestation of bed bugs, trash, plumbing problems ("sewage pipe was clogged up"), and the home needed a new water heater, such that Kathleen had been forced to spend over $12,000.00 to remedy the condition of the 6600 Gregory property and buy a new water heater, after she regained possession of it.[123] Other than such repairs, however, no improvements were made to the 6600 Gregory property after August 2019.[124]

No evidence was presented by anyone about whether, in August 2019, the 6600 Gregory property was in a "disgusting" or "atrocious" condition similar to what was found when the tenant was evicted in April 2022. In August 2019, the tenant was still in possession of the property, and neither Kathleen nor Jason had access to the property, until the tenant was evicted almost three years later, in April 2022.[125] Mr. Dryer admitted that if the 6600 Gregory property had been in such a disgusting condition in August 2019, that would have adversely affected the value of the property, by the amount it would cost to remedy the condition. But the property was not in that condition when Mr. Dryer inspected the property in June 2022, so he did not reduce

---

[122]  *See* Tr. of testimony of Jason Wylie (Docket # 153) at 250; Tr. of testimony of Leah Wylie (Docket # 154) at 16.

[123]  *See* Tr. of testimony of Kathleen Sullivan (Docket # 153) at 203-05, 216-18.

[124]  *See* Tr. of testimony of Jason Wylie (Docket # 153) at 222, 250.

[125]  *See* Tr. of testimony of Kathleen Sullivan (Docket # 153) at 218 (the tenant "never let anybody in the house").

52

his appraised value for the 6600 Gregory property to reflect such a condition.[126]

Another problem with Mr. Dryer's valuation opinion is that it was explicitly based, in part, on an incorrect assumption. The appraisal report states:

> **There was dampness and water leakage in the basement area**. The appraiser is not qualified to determine the cause of the water leakage or the required repairs. **This appraisal is based on the extraordinary assumption that there is no water leakage or dampness in the basement**.[127]

Mr. Dryer testified that he did not know whether this dampness and water leakage in the basement was present in August 2019, but that if it was, that could reduce the value of the property by the cost of the repair needed to fix the problem.[128]

No evidence was presented by anyone about whether, in August 2019, the 6600 Gregory property had this dampness and leakage of water in the basement. Again, neither Kathleen nor Jason had access to the property at that time, and Kathleen did not gain access until April 2022.

The Court finds a lower value for the 6600 Gregory property than that found by Mr. Dryer. Because no evidence was presented by anyone about whether in August 2019 the 6600 Gregory property had the foregoing problems affecting the value of the property (disgusting condition, bed bugs, trash, plumbing problem, dampness and leakage in the basement), the Court must assume that the property *did* have such problems at that time. That is because it was the Trustee's burden to present evidence about whether such conditions existed in August 2019, as

---

[126] *See* Tr. of testimony of Dean W. Dryer (Docket # 153) at 24-26.

[127] PX-28 (Docket # 119-30) at pdf p. 2 (emphasis added); *see also* Tr. of testimony of Dean W. Dryer (Docket # 153) at 19.

[128] Tr. of testimony of Dean W. Dryer (Docket # 153) at 19-20, 30.

part of the Trustee's burden of proving the value of the 6600 Gregory property. As a result, and because Mr. Dryer's opinion of value would be lower if these problems had existed in August 2019, the Court must reduce the value it finds for this property from the $232,000.00 value found by Mr. Dryer.

Under the circumstances, the Court agrees with Kathleen that a $25,000.00 reduction must be made to Mr. Dryer's $232,000.00 valuation.

Except for the need to make this reduction, the Court finds Mr. Dryer's testimony and expert opinion persuasive, and so the Court finds that the value of the 6600 Gregory property as of August 19, 2019 was $207,000.00. The Trustee has proven that value by a preponderance of the evidence.

### d. The total value of the three properties that Jason transferred to Kathleen in August 2019

For the reasons discussed above, the Court finds that the values of the properties that Jason transferred to Kathleen in August 2019 were:

| | |
|---|---|
| 6401 Mast property | $370,000.00 |
| 7575 N. Territorial property | $316,000.00 |
| 6600 Gregory property | $207,000.00 |
| **Total**: | **$893,000.00** |

### 5. The "reasonably equivalent value" conclusion

The Court finds and concludes, from a preponderance of the evidence, that when Jason Wylie transferred the 6401 Mast property to Kathleen Sullivan in August 2019, Jason Wylie "received less than a reasonably equivalent value in exchange for" the transfer, within the meaning of 11 U.S.C. § 548(a)(1)(B). As a result, and because all the other elements for avoidance under § 548(a)(1)(B) are met, the transfer is avoidable, as constructively fraudulent.

54

This is so because (1) in the August 2019 "Mutual Release in Full" transaction, the Debtor Jason Wylie transferred three pieces of real property to Defendant Kathleen Sullivan, including the 6401 Mast property, and those properties had a total value of $893,000.00; and (2) in exchange for those transfers, Jason Wylie received a release and satisfaction of debt that he owed to Kathleen Sullivan in the total amount of $737,516.12, and nothing more.

Thus, the value Jason Wylie gave exceeded, by $155,483.88, the value he received from Kathleen Sullivan in exchange. That means that Jason Wylie received far less than "a reasonably equivalent value in exchange for" the transfers he made.

This conclusion is strengthened when one considers that in the "Mutual Release in Full" transaction, Jason's debt to Kathleen that was released was Jason's debt under two mortgage notes — *i.e.*, the $500,000.00 debt on the Amended Mortgage Note secured by the mortgage on the 7575 N. Territorial property, and the $237,516.12 debt on the 6600 Gregory Note secured by the mortgage on the 6600 Gregory property. These mortgage debts totaled $737,516.12. In partial exchange for the release of these two mortgage debts, Jason transferred to Kathleen the two properties encumbered by the two mortgages — *i.e.*, the 7575 N. Territorial property and the 6600 Gregory property, which the Court has found were worth $316,000.00 and $207,000.00 respectively, for a total value of $523,000.00. This trade — release of two mortgage notes in exchange for transfer of the two mortgaged properties — left a shortfall (a deficiency) for Kathleen of $214,516.12 ($737,516.12 - $523,000.00 = $214,516.12). To cover that shortfall, Jason also transferred to Kathleen the 6401 Mast property, which was not encumbered by any mortgage and which therefore had equity in the amount of the full $370,000.00 value of the property. But that transfer of the unencumbered 6401 Mast property did more than cover the

55

$214,516.12 shortfall; it also gave away to Kathleen an extra $155,483.88 above and beyond the amount of secured debt she held, to the detriment of Jason's unsecured creditors.

Viewing the transaction as a whole, as the Court must, the transfer of the 6401 Mast property is avoidable and must be avoided. The Court will enter a judgment for the Trustee on Count I of the Trustee's complaint.

**B. Count III of the Trustee's complaint: recovery of the property transferred, under 11 U.S.C. § 550(a)(1)**

The parties stipulated, and it is clear, that the transfer of the 6401 Mast property was both to and for the benefit of Defendant Kathleen Sullivan.[129] As the initial transferee of the transfers, Defendant Kathleen Sullivan is subject to 11 U.S.C. § 550(a)(1), which states in pertinent part that "to the extent a transfer is avoided under section . . . 548 . . ., the trustee may recover for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from . . . the initial transferee of such transfer. . . ."

Because the transfer of the 6401 Mast property will be avoided, the Court also will enter a judgment for the Trustee on Count III of the complaint, for the Trustee's recovery of the 6401 Mast property.[130] That property now will be property of the bankruptcy estate in the Chapter 7 bankruptcy case of Jason Wylie and Leah Wylie.

**C. Count II of the Trustee's complaint: the Trustee's actual fraud fraudulent transfer claim under 11 U.S.C. § 548(a)(1)(A)**

---

[129] *See* "Order Regarding Stipulated Facts and Admitted Exhibits for Purposes of Trial" (Docket # 116) at 2 ¶ 6.

[130] *See* Joint Final Pretrial Order (Docket # 112) at 39 ¶ 9 (Trustee seeking "[r]ecovery of the [6401 Mast p]roperty or alternatively the value of the [6401 Mast p]roperty, in an amount not less than $380,000.00").

In Count II of his complaint, the Trustee seeks to avoid the transfer of the 6401 Mast property on the ground that the transfer was made by the Debtor Jason Wylie with "actual intent to hinder, delay, or defraud" creditors, within the meaning of 11 U.S.C. § 548(a)(1)(A). This section states, in the parts relevant to this case:

> (1) The trustee may avoid any transfer . . . of an interest of the debtor in property, . . . that was made . . . within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> . . .
>
> (A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . ., indebted; . . .

The Trustee contends that Jason Wylie actually intended to hinder, delay, or defraud his creditors, when he made the transfer of the 6401 Mast property to his mother, Defendant Kathleen Sullivan. This was proven at trial, the Trustee argues, by proof of numerous so-called "badges of fraud" and by other evidence giving rise to an inference of fraudulent intent. The Defendant Kathleen Sullivan denies that Jason Wylie had any such intent.

This Court has described the badges of fraud in prior cases. For example, in a case that will be familiar to the attorneys in this case, the Court held as follows:

> As noted earlier in this opinion, "intent to defraud" may be shown by circumstantial evidence. *See Hobbs v. Rao* (*In re Rao*), 526 B.R. 623, 627 (Bankr. E.D. La. 2015). Such evidence may include the so-called "badges of fraud."
>
> > In order to determine actual intent, based upon circumstantial evidence, many courts consider the following "badges of fraud":
> >
> > (i) the lack of adequate consideration for the transfer; (ii) the family, friendship, or close

57

> relationship between the parties; (iii) the retention
> of possession, benefit, or use of the property in
> question by the debtor; (iv) the financial condition
> of the party sought to be charged prior to and after
> the transaction in question; (v) the conveyance of all
> of the debtor's property; (vi) the secrecy of the
> conveyance; (vii) the existence or cumulative effect
> of a pattern or series of transactions or course of
> conduct after incurring of debt, onset of financial
> difficulties, or pendency or threat of suit by
> creditors; and (viii) the general chronology of events
> and transactions under inquiry.

> [*E. Diversified Distrib., Inc. v. Matus* (*In re*] *Matus*[)], 303 B.R.
> [660,] 672-73 [(Bankr. N.D. Ga. 2004)]; *see also Stevenson v.
> Cutler* (*In re Cutler*), 291 B.R. 718, 723 (Bankr. E.D. Mich. 2003);
> *Nashville City Bank & Trust Co. v. Peery* (*In re Peery*), 40 B.R.
> 811, 815 (Bankr. M.D. Tenn. 1984). Additional factors indicating a
> debtor's actual intent include

>> whether the transaction is conducted at arm's
>> length; whether the debtor is aware of the existence
>> of a significant judgment or over-due debt; whether
>> a creditor is in hot pursuit of its judgment or claim
>> and whether the debtor knows this; and the timing
>> of the transfer relative to the filing of the petition.
>> . . .

> *Gordon v. Courtney* (*In re Courtney*), 351 B.R. 491, 500 (Bankr.
> E.D. Tenn. 2006).

*Miller v. Wylie* (*In re Wylie*), 649 B.R. 852, 862 (Bankr. E.D. Mich. 2023), *rev'd on other grounds*, 657 B.R. 602 (E.D. Mich. 2024) (quoting *Wise v.* Wise (*In re Wise*), 590 B.R. 401, 435-36 (Bankr. E.D. Mich. 2018)).

In this case, the Trustee has proven a number of the badges of fraud. Jason Wylie transferred the 6401 Mast property to his mother; it was not an arms length transaction; it was for less than reasonably equivalent value, as the Court has found; it was done when Jason Wylie was

58

insolvent; it was part of a conveyance of substantially all of Jason Wylie's property, much of it to members of his family; Jason Wylie, with the assistance of his attorney, was clearly contemplating bankruptcy at the time of the transfer; the transfer was made just outside the one-year look back for possible avoidance as a preferential transfer to an insider under 11 U.S.C. § 547(b) (the transfer was made on August 19, 2019, just over a year before Jason Wylie filed his bankruptcy case on August 27, 2020); and the transfer appears to have been part of a great deal of bankruptcy planning by Jason Wylie.

In addition, as this Court has previously found, Jason Wylie made false statements under oath in the schedules he filed in his bankruptcy case. *See Miller v. Wylie* (*In re Wylie*), 649 B.R. at 874-75. But the Court also found that Jason Wylie did not make those false statements with an intent to deceive anyone, or with any fraudulent intent. *See id.* at 875-77. In addition to the false statements identified in the case just cited, Jason Wylie made misleading statements in his Statement of Financial Affairs, about his transfer of the 6401 Mast property to his mother Kathleen Sullivan. In listing that transfer at Item no. 18 (transfers made within 2 years pre-bankruptcy), Jason Wylie described the transfer of the 6401 Mast property this way: "Debtor quit-claimed farmland subject to conservation easement in a deed-in-lieu-of foreclosure transaction."[131] That statement was misleading, because, as Jason Wylie and his attorney both knew at the time, the only mortgage on the 6401 Mast property had been released and discharged of record in June 2014, more than five years before the transfer of the 6401 Mast property.[132] But

---

[131] PX-5 at pdf p. 63 (Item no. 18 in the Statement of Financial Affairs filed on August 27, 2020 at Docket # 1 in Case No. 20-49216).

[132] *See* Part III.A.c of this Opinion; Tr. of testimony of Thomas R. Morris (Docket # 154) at 49-50.

that mortgage discharge was recorded, and therefore was a matter of public record, so it is unlikely that either Jason Wylie or his attorney intended to deceive anyone with this misleading statement.

In this case, there are many badges of fraud present, from which the Court could draw an inference and find that Jason Wylie's actual intent in transferring the 6401 Mast property to his mother was to hinder, delay, or defraud his creditors.

But the Court will not make such a finding. Rather, the Court finds, and the evidence clearly and overwhelmingly shows, that Jason Wylie made the transfer with the sole intention of preferring one of his creditors — his mother— over his other creditors.

As this Court has held in other cases, "an intent to prefer one creditor over other creditors does not constitute an intent to 'hinder, delay, or defraud creditors,'" within the meaning of § 548(a)(1)(A). *Wells v. THB Am., LLC* (*In re Clements Mfr. Liquidation Co., LLC*), 521 B.R. 231, 251 (Bankr. E.D. Mich. 2014) (citations omitted); *see also Miller v. Wylie* (*In re Wylie*), 649 B.R. at 866-67 (citations omitted) (same, within the meaning of 11 U.S.C. § 727(a)(2)(A)).

For these reasons, the Court concludes that the Trustee has failed to meet his burden of proving, by a preponderance of the evidence, that Jason Wylie made the transfer of the 6401 Mast property with the actual intent to hinder, delay, or defraud any of his creditors. The Court will enter judgment in favor of the Defendant Kathleen Sullivan on Count II of the complaint.

## IV. Conclusion

For the reasons stated in this Opinion, the Court will enter a judgment in favor of the Trustee on Counts I and III of the complaint, avoiding Jason Wylie's August 2019 transfer of the 6401 Mast property to Kathleen Sullivan, and recovering that property for the bankruptcy estate.

60

The judgment will be in favor of the Defendant Kathleen Sullivan on Count II of the complaint, dismissing that count with prejudice.

Signed on October 18, 2024



/s/ Thomas J. Tucker
**Thomas J. Tucker**
**United States Bankruptcy Judge**